Michael COLEMAN, Plaintiff,

v.

HOLIDAY INN SELECT, Defendant.

No. Civ.A.4:00CV000309GH.

United States District Court,
E.D. Arkansas,
Western Division.

Aug. 9, 2001.

Austin Porter, Jr., Little Rock, AR, for plaintiff.

Oscar E. Davis, Jr., Daniel Lee Herrington, Friday, Eldredge & Clark, Little Rock, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Michael Coleman (plaintiff) filed this action *pro se* on April 19, 2000 pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., alleging that Holiday Inn Select (defendant) terminated his employment with defendant on July 29, 1997, because defendant "regarded [him] as being disabled" in violation of the Americans with Disabilities Act (the ADA).

On January 20, 2001, defendant filed a motion for summary judgment supported by brief, exhibits and a statement of alleged undisputed facts. On June 5, 2001, plaintiff filed his brief, exhibits and statement of alleged material facts.[1] Defen-

---

1. On April 19, 2001, the Court, *sua sponte*, appointed Austin Porter, Esq., to represent plaintiff inasmuch as the Court was persuaded that defendant's motion for summary judg- ment raised complex issues and counsel for plaintiff would be beneficial to the Court and parties as well in resolving these complex issues objectively.

dant filed a reply brief on June 15, 2001. For the reasons, hereinafter discussed, the Court finds that defendant's motion for summary judgment should be denied.

## BACKGROUND

Plaintiff was employed by defendant on January 4, 1997, as a maintenance employee in the Engineering Department. John Hunt, Chief Engineer, was plaintiff's immediate supervisor. Plaintiff successfully completed his 90 day probationary period and was evaluated in April, 1997, as a "reliable and dependable employee."

Plaintiff alleges that on July 21, 1997, he injured his back while loading carpet in a van. Plaintiff testified as follows, during his deposition, in response to questions posed by defense counsel regarding plaintiff's failure to advise his supervisor of the incident resulting in his alleged injury:

Q. Well, did you have an opportunity to report this injury to anybody?

A. Probably, but I thought, you know, like I say—

Q. Did you?

A.—I thought it'd pass. Not till the 23rd. Not till the 23rd.

Q. So you didn't report it at all on the 21st?

A. Right.

Q. And why didn't you?

A. Like I say, I guess I thought it would go away. It was a gradual onset where it escalated so I just, you know, I have little similar scrapes or, you know, you do a little something and you figure it'll pass, you know, but it wasn't—it didn't reach its severity so it just like a sharp pain ran up, something I'd never felt before. Stopped and was minimal but there—and then it kind of escalated I guess the last couple of days so—

On July 23, 1997, Mr. Hunt assigned plaintiff to load scrap pieces of carpet and padding into a U–Haul truck. Plaintiff advised Mr. Hunt that the carpet was too heavy and that he was not going to pick it up. Mr. Hunt, in response, advised plaintiff "That if he was not going to work that he needed to clock out and go home or go to the doctor...." Mr. Hunt's affidavit of January 29, 2000 and designated as defendant's exhibit B narrates the exchange between the two as follows:

11. In response to that, Mr. Coleman then stated for the first time to me, and to my knowledge the first time to anyone at Holiday Inn, that his back hurt. He did not mention how or where he had hurt his back and he did not elaborate. *In response to his comment that his back was hurt I told him that he needed to clock out and go home, or go to the doctor, or whatever he needed to do.* He had worked on July 21, 22, and the morning of 23rd without even saying anything about his back. I couldn't just have him sit around and do nothing. I did not believe his story about his back. (Emphasis added .)

Plaintiff immediately left his employment as directed by Mr. Hunt and visited the emergency room of the John L. McClellan Memorial Veterans Hospital and was examined by a physician. Plaintiff was advised that he had a lumbar strain; and that he should not return to work until the following Monday, July 28. On Thursday, July 24, plaintiff advised defendant by telephone of the physician's diagnosis and advice and, in addition, delivered copies of the physician's Clinical Record and Medical Certificate to defendant.[2] Plaintiff visited the Veterans Hospital again on July 27th.

---

2. The clinical record provides, among other things, "light duty next week, continue [designated medication] and appt. will be mailed for neurosurgery." See defendant's exhibit 5.

The Medical Certificate provides, in part: "Triage Back Pain ... injured Back in March 1997 re-injured Back 7–21–97."

Plaintiff offered the following testimony relative to the blemish or tarnish that was made through the statement "Off work rest of the week: Return Monday." that was written on the Medical Certificate delivered to defendant on July 24th:

The witness: The black marks, the secretary from our department at that time put the mark through there.

Q. Black mark out where?

A. She marked, I guess what she thought was the important and she—that's why it's black in that—

Q. Okay. When you say "the secretary" do you mean the secretary, at the hospital?

A. Secretary at the job.

Plaintiff returned to work on Monday, July 28, as directed by his physician and was assigned light duty work. Plaintiff testified as follows in response to defense counsel's questions about the light duty assignment:

Q. When you say you worked light duty on Monday, did you work an entire shift?

A. All day.

Q. And what did you do, doing light duty?

A. Work orders.

A. What do you mean by that?

Q. In other words, you have a guest that may've had a complaint in the room or something to that nature or it was an existing problem in a room so somebody at the front desk might write that work on up and you'd pick them work orders up and, you know, you service whatever the work order says, try to.

Plaintiff also returned to work on Tuesday, July 29, and performed light duty work until the lunch break when his supervisor summoned plaintiff to the office and terminated plaintiff. Plaintiff was given a document, dated July 28, 1997, setting forth the alleged reasons for plaintiff's discharge and plaintiff was requested to sign the document, but plaintiff refused to sign the document.

The termination document lists the following alleged conduct that served as basis for defendant's decision to terminate plaintiff:

1. UNAUTHORIZED ABSENCE FROM WORK AREA.

On July 22, 1997 Michael Coleman left the property without permission and was gone over an hour. He told a co-worker James Prater but did not inform his supervisor. He clocked in when returned but failed to clock out when he left. The following day he left the property for lunch and was caught returning 15 minutes late by his department head.

2. TELEPHONE USE.

He has been receiving numerous personal phone calls while on duty and was recently caught in a guest room sitting on the dresser taking a personal phone call. 7/28/97 he has had 4 personal incoming phone calls we are aware of.

3. FAILURE TO FOLLOW PROPER CALL IN PROCEDURES.

On Thursday July 24, 1997 he called in at 9:30 a.m. to say he would not be in for his shift. The handbook states you must call in 3 hours prior to your shift and contact your supervisor, not a co-worker.

4. TEAM MEMBER MEAL PLAN.

No records indicate that he purchased a meal ticket for the months of June or July until 7/28/97 but has been receiving employee meals to include breakfast.

Plaintiff gave the following testimony, during his deposition, in responding to questions pose by defense counsel:

Q. Okay. Then how did you find out you were discharged?

A. I came back to work. I worked light duty that Monday. Then the following day I worked about half a day and they terminated me. Came in and called me in the office and—

Q. When you say you worked light duty on Monday, did you work an entire shift?

A. All day.

Q. And what did you do, doing light duty?

A. Work orders.

Q. What do you mean by that?

A. In other words, you have a guest that may've had a complaint in the room or something of that nature or it was an existing problem in a room so somebody at the front desk might write that work up and you'd pick work order up and, you know, you service whatever the work order says, try to.

. . . .

Q. Okay. And you say you came back to work the next day?

A. Following my first day?

Q. Yes.

A. On light duty?

Q. Yes.

A. Yeah, I came back to work Tuesday.

. . . .

Q. Okay. And who terminated you, who discharged you?

A. Mr. Hunt.

Q. And tell me about that. Did he do it early in the morning or when you first got there?

A. At lunch time. I worked half the day. Lunch time he called me in, had a document for me to sign. . . . I didn't sign it and I just said, okay and left, kind of chuckled at that because it didn't make sense to me.

. . . .

Q. Why didn't you discuss the points with him? Did you agree with those points?

A. I didn't agree with any of them.

Q. Well, why didn't you talk about it then? Why didn't you defend yourself?

A. He terminated me.

. . . .

Q. It says, "He has had four personal incoming phone calls we are aware of."

A. Uh-huh.

Q. Do you remember receiving those four phone calls on the last full day you worked?

A. One. Yeah.

Q. One. What was it about?

A. My injury.

Q. Who called you?

A. I called the VA cause I had some complications, some numbness on my whole right side. I was worried. You call them, the triage and they call you back to check on you. So that's the only call that I can remember. Maybe they called more than once and didn't get me. I don't know.

. . . .

Q. All right. Now the fourth point on here was "Team Member Meal Plan." "No records indicate that he purchased a meal ticket for the months of June or July until 7–28–97 but has been receiving employee meals to include breakfast." Have you been receiving employee meals during June and July?

A. I guess so.

. . . .

Q. My question, sir, is are you saying that you remember paying it?

A. Yes. It's payroll deduction.

*SUMMARY JUDGMENT STANDARD*

 Summary judgment is appropriate only where there are no genuine issues

of material fact to be resolved, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Given the fact that discrimination cases most often rest upon inferences rather than direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant and "summary judgment should seldom be used in employment—discrimination cases." See: *Oldham v. West*, 47 F.3d 985 (8th Cir.1995); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994). See also: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. . . ." Nevertheless "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). Summary judgment is used most sparingly and with added caution in cases involving delicate rights where credibility, motive and intent are crucial issues. See: Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2726. See also: *Oldham v. West*, 47 F.3d 985, 988 (8th Cir.1995).

## DISCUSSION

42 U.S.C. § 12112(a) of the Americans With Disabilities Act (ADA) provides:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

■ To state a prima facie case under ADA, plaintiff must prove that (1) he suffers from a "disability" (2) he is a "qualified individual" to perform the essential functions of his job either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. See: *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir.1995).

Defendant contends that, as a matter of law, plaintiff (1) was not disabled at the time of his discharge; (2) was not qualified to continue employment with defendant as well as not qualified for his job because of his poor performance; (3) cannot establish that defendant's reasons for his discharge are a pretext for disability discrimination; and (4) is not entitled to relief—because of the after-acquired evidence doctrine—due to misrepresentations on his application for employment and to defendant's insurance carrier.

The ADA defines "disability" with respect to an individual as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).

■ The Court is persuaded that the record contains sufficient evidence to present a genuine issue of fact as to whether plaintiff qualifies as disabled under the ADA. Plaintiff asserts that on July 23, 1997, when Mr. Hunt, plaintiff's immediate supervisor, assigned him to load scrap carpet and padding into a truck, plaintiff advised Mr. Hunt that the carpet was too heavy and indicated that he had sustained an injury, Mr. Hunt advised plaintiff "he needed to clock out and go home, or go to the doctor, or whatever he needed to do." Plaintiff states that he did as Mr. Hunt directed and visited the emergency room of the Veterans Hospital and was diagnosed as having sustained a lumbar strain; that he was supplied with a physician's Clinical Record and a Medical Certificate

stating that plaintiff had injured his back in March 1997, and had re-injured his back on July 21, 1997; that plaintiff should not return to work until July 28, 1997, and should be assigned light duty work. Plaintiff testified that on July 24, 1997, he first advised defendant by telephone of his physician's diagnosis and advice and delivered to defendant, the same day, copies of the medical records.[3] Plaintiff further testified that he returned to work, as directed by his physician, on July 28, and his supervisor placed him on light duty work where he worked the entire day. Plaintiff returned the following day and performed the same light duty work until the noon break when his supervisor summoned him to the office and gave him a termination letter. The letter asserted numerous alleged violations by plaintiff of defendant's rules and regulations, that all employees were made aware of and had agreed to follow, served as a basis for plaintiff's discharge. Plaintiff refused to sign the termination letter and testified, during his deposition, that "I didn't agree with any of the [alleged violations]"; and that he did not defend himself because "[h]e terminated me."

This Court is of the view that if Mr. Hunt regarded plaintiff's back condition as substantially limiting a major life activity, plaintiff had a disability under ADA. The record reflects that Mr. Hunt accepted the physician's diagnosis and treated plaintiff as being unable to perform his regular duties by placing plaintiff on light duty work, as directed by the physician, for one day and a half before terminating plaintiff. A genuine issue of fact exists as to whether Mr. Hunt regarded plaintiff as having a disability for purposes of ADA.

■ Defendant's second argument is that plaintiff was not qualified. The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desire." 42 U.S.C. § 12111(8).

Upon returning to work on July 29, 1997, plaintiff was assigned, as previously noted a light duty position and there is an inference flowing from the record that plaintiff performed the light duty assignment skillfully for a day and a half. The Court is persuaded that there is an inference that reasonable accommodation is possible. Accordingly, a genuine issue of fact exists as to whether plaintiff was capable of performing the essential functions of his job with accommodation and whether such accommodation would have been reasonable under the circumstances. *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1111 (8th Cir.1995) (stating that once plaintiff makes a showing that reasonable accommodation is possible, the burden of production shifts to employer to show that it is unable to accommodate plaintiff).

■ Relative to defendant's assertion that plaintiff performed poorly on his job and that plaintiff cannot establish that defendant's asserted reasons for terminating plaintiff are pretextual, the Court is of the view that there is relevant evidence in the record which, at the very least, implicate motive, intent and credibility regarding the claim that plaintiff violated defendant's rules and regulations. For example, plaintiff, in response to defense counsel's questions, during discovery, denied having any

**3.** Plaintiff testified, during his deposition, that defendant's secretary had tarnished the statement "Off work rest of the week: Return Monday" that was written by his physician on the Medical Certificate and which was delivered by plaintiff to defendant on July 24. On the other hand, this alleged action may have been an attempt by defendant's secretary to highlight the provision. At any rate, it appears that credibility, motive and intent are implicated. See: defendant's exhibit 6.

"problems" with his supervisor regarding plaintiff's work performance; plaintiff was employed by defendant during January, 1997, and successfully completed his 90 day probationary period and was evaluated in April, 1997, as "a reliable and dependable employee"; and that the Administrative Law Judge for the Arkansas Workers' Compensation Commission found, in an opinion denying plaintiff's claim for benefits, that Mr. Hunt acknowledged, when plaintiff disclosed on July 23, that plaintiff had sustained an injury, that he (Mr. Hunt) did not fill out an incident report at that time because plaintiff's course of conduct made him angry.

In reflecting on the following Supreme Court's declaration in *McKennon v. Nashville Banner Publishing Company,* 513 U.S. 352, 357, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995), the Court is confident that plaintiff is entitled to a jury determination of whether he performed poorly on his job and violated defendant's rules and regulations as asserted by defendant given the circumstances just noted regarding the relationship between plaintiff and Mr. Hunt:

> The ADEA and Title VII share common substantive features and also a common purpose: 'the elimination of discrimination in the work place.' (Citations omitted). Congress designed the remedial measure in these statutes to serve as a 'spur or catalyst' to cause employers 'to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination. (Citations omitted). Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another.

Finally, defendant contends that plaintiff is not entitled to relief because plaintiff willfully failed to disclose on his resume and application for employment that plaintiff had previously worked for Quality Foods and was suspended; that during two separate interviews with defendant's insurance carrier, plaintiff concealed that he had suffered a prior serious back injury, while employed by Quality Foods; and that defendant would not only have fired plaintiff for his dishonesty on the resume and application, but would not have hired him in the first place had he been truthful.

The Court finds that defendant will have the responsibility to establish that the after-acquired evidence reflecting that plaintiff failed to disclose in his application his employment with Quality Foods which resulted in a suspension and that he sustained an injury while employed by Quality Foods were serious enough to warrant either termination or a justifiable reason for not employing plaintiff in the first place. See: *McKennon v. Nashville Banner Publishing Company,* supra, at 361, 115 S.Ct. at 886. (stating that when an employer seeks to rely on after-acquired evidence, it must establish that the employee's wrongdoing was so harsh that he would have been discharged on those grounds alone).

Inasmuch as the Court has found there are material issues of fact for trial, defendant's motion for summary judgment is denied.